## WILLIAMS v. NEW YORK.

No. 671.   Argued April 21, 1949.—Decided June 6, 1949.

*John F. Finerty* argued the cause for appellant. With him on the brief was *Edward H. Levine.*

. *Solomon A. Klein* argued the cause for respondent. With him on the brief was *Miles F. McDonald.* ·

MR. JUSTICE BLACK delivered the opinion of the Court.

A jury in a New York state court found appellant guilty of murder in the first degree.[1] The jury recommended life imprisonment, but the trial judge imposed sentence of death.[2] In giving his reasons for imposing the death sentence the judge discussed in open court the evidence upon which the jury had convicted stating that this evidence had been considered in the light of additional information obtained through the court's "Probation Department, and through other sources." Consideration of

---

[1] "The killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed:

"2. By an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual; or without a design to effect death, by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise . . . ." New York Penal Law § 1044.

[2] "Murder in the first degree is punishable by death, unless the jury recommends life imprisonment as provided by section ten hundred forty-five-a." New York Penal Law § 1045.

"A jury finding a person guilty of murder in the first degree, as defined by subdivision two of section ten hundred forty-four, may, as a part of its verdict, recommend that the defendant be imprisoned for the term of his natural life. Upon such recommendation, the court may sentence the defendant to imprisonment for the term of his natural life." New York Penal Law § 1045-a.

this additional information was pursuant to § 482 of New York Criminal Code which provides:

".  .  . Before rendering judgment or pronouncing sentence the court shall cause the defendant's previous criminal record to be submitted to it, including any reports that may have been made as a result of a mental, phychiatric [sic] or physical examination of such person, and may seek any information that will aid the court in determining the proper treatment of such defendant."

The Court of Appeals of New York affirmed the conviction and sentence over the contention that as construed and applied the controlling penal statutes are in violation of the due process clause of the Fourteenth Amendment of the Constitution of the United States "in that the sentence of death was based upon information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal . . . ." 298 N. Y. 803, 804, 83 N. E. 2d 698, 699. Because the statutes were sustained over this constitutional challenge the case is here on appeal under 28 U. S. C. § 1257 (2).

The narrow contention here makes it unnecessary to set out the facts at length. The record shows a carefully conducted trial lasting more than two weeks in which appellant was represented by three appointed lawyers who conducted his defense with fidelity and zeal. The evidence proved a wholly indefensible murder committed by a person engaged in a burglary. The judge instructed the jury that if it returned a verdict of guilty as charged, without recommendation for life sentence, "The Court must impose the death penalty," but if such recommendation was made, "the Court may impose a life sentence." The judge went on to emphasize that "the Court is not bound to accept your recommendation."

About five weeks after the verdict of guilty with rec-
ommendation of life imprisonment, and after a statutory
pre-sentence investigation report to the judge, the de-
fendant was brought to court to be sentenced. Asked
what he had to say, appellant protested his innocence.
After each of his three lawyers had appealed to the court
to accept the jury's recommendation of a life sentence,
the judge gave reasons why he felt that the death sen-
tence should be imposed. He narrated the shocking
details of the crime as shown by the trial evidence, ex-
pressing his own complete belief in appellant's guilt. He
stated that the pre-sentence investigation revealed many
material facts concerning appellant's background which
though relevant to the question of punishment could not
properly have been brought to the attention of the jury
in its consideration of the question of guilt. He referred
to the experience appellant "had had on thirty other
burglaries in and about the same vicinity" where the
murder had been committed. The appellant had not
been convicted of these burglaries although the judge
had information that he had confessed to some and
had been identified as the perpetrator of some of the
others. The judge also referred to certain activities of
appellant as shown by the probation report that indi-
cated appellant possessed "a morbid sexuality" and classi-
fied him as a "menace to society." The accuracy of the
statements made by the judge as to appellant's back-
ground and past practices was not challenged by appel-
lant or his counsel, nor was the judge asked to disregard
any of them or to afford appellant a chance to refute or
discredit any of them by cross-examination or otherwise.

The case presents a serious and difficult question. The
question relates to the rules of evidence applicable to
the manner in which a judge may obtain information to
guide him in the imposition of sentence upon an already
convicted defendant. Within limits fixed by statutes,

New York judges are given a broad discretion to decide the type and extent of punishment for convicted defendants. Here, for example, the judge's discretion was to sentence to life imprisonment or death. To aid a judge in exercising this discretion intelligently the New York procedural policy encourages him to consider information about the convicted person's past life, health, habits, conduct, and mental and moral propensities. The sentencing judge may consider such information even though obtained outside the courtroom from persons whom a defendant has not been permitted to confront or cross-examine. It is the consideration of information obtained by a sentencing judge in this manner that is the basis for appellant's broad constitutional challenge to the New York statutory policy.

Appellant urges that the New York statutory policy is in irreconcilable conflict with the underlying philosophy of a second procedural policy grounded in the due process of law clause of the Fourteenth Amendment. That policy as stated in *In re Oliver*, 333 U. S. 257, 273, is in part that no person shall be tried and convicted of an offense unless he is given reasonable notice of the charges against him and is afforded an opportunity to examine adverse witnesses.[3] That the due process clause does provide these salutary and time-tested protections where the question for consideration is the guilt of a defendant seems entirely clear from the genesis and historical evolution of the clause. See, e. g., *Chambers v. Florida*, 309 U. S. 227, 236–237, and authorities cited in note 10.

---

[3] Other due process requirements mentioned in the *Oliver* case were that the defendant should be permitted to offer evidence in his own behalf and be represented by counsel. Appellant, however, was represented by counsel both when tried and sentenced, and the sentencing judge did not decline to permit introduction of any evidence. In response to the judge's inquiry, statements were made by appellant and his counsel.

Tribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations.[4] But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.[5] Out-of-court affidavits have been used frequently, and of course in the smaller communities sentencing judges naturally have in mind their knowledge of the personalities and backgrounds of convicted offenders.[6] A recent manifestation of the historical latitude allowed sentencing judges appears in Rule 32 of the Federal Rules of Criminal Procedure. That rule provides for consideration by federal judges of reports made by probation officers containing information about a convicted defendant, including such information "as may be helpful in imposing sentence or in granting probation or in the correctional treatment of the defendant . . . ."[7]

In addition to the historical basis for different evidentiary rules governing trial and sentencing procedures there are sound practical reasons for the distinction. In a trial before verdict the issue is whether a defendant is guilty of having engaged in certain criminal conduct of which he has been specifically accused. Rules of evi-

---

[4] Courts have treated the rules of evidence applicable to the trial procedure and the sentencing process differently. See, e. g., *Snyder* v. *Massachusetts*, 291 U. S. 97, 107, 128–129; *Graham* v. *West Virginia*, 224 U. S. 616, 619; *United States* v. *Dalhover*, 96 F. 2d 355, 359–360. But cf. *State* v. *Stevenson*, 64 W. Va. 392, 62 S. E. 688.

[5] See cases collected in 14 Am. & Eng. Ann. Cas. 968, *et seq.;* 77 A. L. R. 1211, *et seq.;* 86 A. L. R. 832, *et seq.* See also Note, *The Admissibility of Character Evidence in Determining Sentence,* 9 U. of Chi. L. Rev. 715 (1942).

[6] See Pound, Criminal Justice in America 178 (1930).

[7] See *Stephan* v. *United States,* 133 F. 2d 87, 100. See also 18 U. S. C. § 3655.

dence have been fashioned for criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged. These rules rest in part on a necessity to prevent a time-consuming and confusing trial of collateral issues. They were also designed to prevent tribunals concerned solely with the issue of guilt of a particular offense from being influenced to convict for that offense by evidence that the defendant had habitually engaged in other misconduct. A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.[8] And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.

Undoubtedly the New York statutes emphasize a prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime. *People v. Johnson,* 252 N. Y. 387, 392, 169 N. E. 619, 621. The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender. This whole country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions—even for offenses today deemed

---

[8] Myerson, *Views on Sentencing Criminals,* 7 Law Soc. J. 854 (1937); Glueck, *Principles of a Rational Penal Code,* 41 Harv. L. Rev. 453 (1928); Warner and Cabot, *Administration of Criminal Justice,* 50 Harv. L. Rev. 583, 607 (1937); Comment, *Reform in Federal Penal Procedure,* 53 Yale L. J. 773 (1944).

trivial.[9] ~~Today's~~ philosophy of individualizing sentences makes sharp distinctions for example between first and repeated offenders.[10] Indeterminate sentences the ultimate termination of which are sometimes decided by non-judicial agencies have to a large extent taken the place of the old rigidly fixed punishments.[11] The practice of probation which relies heavily on non-judicial implementation has been accepted as a wise policy.[12] Execution of the United States parole system rests on the discretion of an administrative parole board. 36 Stat. 819, 18 U. S. C. §§ 714, 716, now §§ 4202, 4203. Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence.[13]

Modern changes in the treatment of offenders make it more necessary now than a century ago for observance

---

[9] 2 Blackstone, Commentaries on the Laws of England (Lewis' ed. 1897) 1756–1757.

[10] With respect to this policy in the administration of the Probation Act this Court has said: "It is necessary to individualize each case, to give that careful, humane and comprehensive consideration to the particular situation of each offender which would be possible only in the exercise of a broad discretion." *Burns* v. *United States*, 287 U. S. 216, 220. In *Pennsylvania* v. *Ashe*, 302 U. S. 51, 55, this Court further stated: "For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." And see Wood and Waite, Crime and Its Treatment 438–442 (1941).

[11] Wood and Waite, Crime and Its Treatment 437 (1941); Orfield, Criminal Procedure from Arrest to Appeal 556–565 (1947). See, e. g., Ill. Rev. Stat. c. 38, § 802 (1939); Cal. Pen. Code (Deering, 1941) § 1168.

[12] Glueck, Probation and Criminal Justice 232 (1933); National Probation Assn., Directory of Probation and Parole Officers 275 (1947); Cooley, Probation and Delinquency (1927).

[13] Judge Ulman writing on The Trial Judge's Dilemma discusses the problems that confront the sentencing judge and quotes from

of the distinctions in the evidential procedure in the trial and sentencing processes.//For indeterminate sentences and probation have resulted in an increase in the ·discretionary powers exercised in fixing punishments. In general, these modern changes have not resulted in making the lot of offenders harder. On the contrary a strong motivating force for the changes has been the belief that by careful study of the lives and personalities of convicted offenders many could be less severely punished and restored sooner to complete freedom and useful citizenship. This belief to a large extent has been justified.

Under the practice of individualizing punishments, investigational techniques have been given an important role. Probation workers making reports of their investigations have not been trained to prosecute but to aid offenders. Their reports have been given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information.[14] To deprive sentenc-

---

one of his court opinions as to the factors that a judge should consider in imposing sentence:

"1st. The protection of society against wrong-doers.

"2nd. The punishment—or much better—the discipline of the wrong-doer.

"3rd. The reformation and rehabilitation of the wrong-doer.

"4th. The deterrence of others from the commission of like offenses.

"It should be obvious that a proper dealing with these factors involves a study of each case upon an individual basis. Was the crime a crime against property only, or did it involve danger to human life? Was it a crime of sudden passion or was it studied and deliberate? Is the criminal a man so constituted and so habituated to war upon society that there is little or no real hope that he ever can be anything other than a menace to society—or is he obviously amenable to reformation?" Glueck, Probation and Criminal Justice 113 (1933).

See also 12 Encyc. of Soc. Science, Penal Institutions 57–64 (1934).

[14] The late Federal Judge Lewis B. Schwellenbach in his article on the difficulties that confront a sentencing judge wrote: "The knowledge of the life of a man, his background and his family, is the only

ing judges of this kind of information would undermine modern penological procedural policies that have been cautiously adopted throughout the nation after careful consideration and experimentation. We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination. And the modern probation report draws on information concerning every aspect of a defendant's life.[15] The type and extent of this information make totally impractical if not impossible open court testimony with cross-examination. Such a procedure could endlessly delay criminal administration in a retrial of collateral issues.

The considerations we have set out admonish us against treating the due process clause as a uniform command that courts throughout the Nation abandon their age-old

---

proper basis for the determination as to his treatment. There is no substitute for information. The sentencing judge in the federal court has the tools with which to acquire that information. Failure to make full use of those tools cannot be justified." Schwellenbach, *Information vs. Intuition in the Imposition of Sentence*, 27 J. Am. Jud. Soc. 52 (1943). And see McGuire and Holtzoff, *The Problem of Sentence in the Criminal Law*, 20 B. U. L. Rev. 423 (1940).

[15] A publication circulated by the Administrative Office of the United States Courts contains a suggested form for all United States probation reports and serves as an example of the type of information contained in the reports. This form consists of thirteen "marginal headings." (1) Offense; (2) Prior Record; (3) Family History; (4) Home and Neighborhood; (5) Education; (6) Religion; (7) Interests and Activities; (8) Health (physical and mental); (9) Employment; (10) Resources; (11) Summary; (12) Plan; and (13) Agencies Interested. Each of the headings is further broken down into sub-headings. The form represents a framework into which information can be inserted to give the sentencing judge a composite picture of the defendant. Administrative Office of the United States Courts, The Presentence Investigation Report, Pub. No. 101 (1943).

practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence. New York criminal statutes set wide limits for maximum and minimum sentences.[16] Under New York statutes a state judge cannot escape his grave responsibility of fixing sentence. In determining whether a defendant shall receive a one-year minimum or a twenty-year maximum sentence, we do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court. The due process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due process clause would hinder if not preclude all courts—state and federal—from making progressive efforts to improve the administration of criminal justice.

It is urged, however, that we should draw a constitutional distinction as to the procedure for obtaining information where the death sentence is imposed. We cannot accept the contention. Leaving a sentencing judge free to avail himself of out-of-court information in making such a fateful choice of sentences does secure to him a broad discretionary power, one susceptible of abuse. But in considering whether a rigid constitutional barrier should be created, it must be remembered that there is possibility of abuse wherever a judge must choose between life imprisonment and death. And it is con-

---

[16] A few New York criminal statutes will illustrate the broad statutory limits within which the sentencing judge must fix a defendant's penalty. Robbery in the first degree is punishable by imprisonment for not "less than ten years" nor "more than thirty years." New York Penal Law § 2125. Rape in the first degree is "punishable by imprisonment for not more than twenty years." New York Penal Law § 2010. Burglary in the first degree is punishable by imprisonment from ten to thirty years, burglary in the second degree "for a term not exceeding fifteen years." New York Penal Law § 407.

ceded that no federal constitutional objection would have been possible if the judge here had sentenced appellant to death because appellant's trial manner impressed the judge that appellant was a bad risk for society, or if the judge had sentenced him to death giving no reason at all. We cannot say that the due process clause renders a sentence void merely because a judge gets additional out-of-court information to assist him in the exercise of this awesome power of imposing the death sentence.

Appellant was found guilty after a fairly conducted trial. His sentence followed a hearing conducted by the judge. Upon the judge's inquiry as to why sentence should not be imposed, the defendant made statements. His counsel made extended arguments. The case went to the highest court in the state, and that court had power to reverse for abuse of discretion or legal error in the imposition of the sentence.[17] That court affirmed. We hold that appellant was not denied due process of law.[18]

*Affirmed.*

Mr. Justice Rutledge dissents.

Mr. Justice Murphy, dissenting.

A combination of factors in this case impels me to dissent.

Petitioner was convicted of murder by a jury, and sentenced to death by the judge. The jury which heard the

---

[17] *People* v. *Stein,* 96 Misc. 507, 161 N. Y. S. 1107; *People* v. *Fox,* 202 N. Y. 616, 96 N. E. 1126; *People* v. *Johnson,* 252 N. Y. 387, 393, 169 N. E. 619, 621. And see *Commonwealth* v. *Johnson,* 348 Pa. 349, 35 A. 2d 312. As to English procedure see 28 Cr. App. R. 89, 90–91. Also see Note, *Right of Criminal Offenders to Challenge Reports Used in Determining Sentence,* 49 Col. L. Rev. 567 (1949).

[18] What we have said is not to be accepted as a holding that the sentencing procedure is immune from scrutiny under the due process clause. See *Townsend* v. *Burke,* 334 U. S. 736.

trial unanimously recommended life imprisonment as a suitable punishment for the defendant. They had observed him throughout the trial, had heard all the evidence adduced against him, and in spite of the shocking character of the crime of which they found him guilty, were unwilling to decree that his life should be taken. In our criminal courts the jury sits as the representative of the community; its voice is that of the society against which the crime was committed. A judge, even though vested with statutory authority to do so, should hesitate indeed to increase the severity of such a community expression.

He should be willing to increase it, moreover, only with the most scrupulous regard for the rights of the defendant. The record before us indicates that the judge exercised his discretion to deprive a man of his life, in reliance on material made available to him in a probation report, consisting almost entirely of evidence that would have been inadmissible at the trial. Some, such as allegations of prior crimes, was irrelevant. Much was incompetent as hearsay. All was damaging, and none was subject to scrutiny by the defendant.

Due process of law includes at least the idea that a person accused of crime shall be accorded a fair hearing through all the stages of the proceedings against him. I agree with the Court as to the value and humaneness of liberal use of probation reports as developed by modern penologists, but, in a capital case, against the unanimous recommendation of a jury, where the report would concededly not have been admissible at the trial, and was not subject to examination by the defendant, I am forced to conclude that the high commands of due process were not obeyed.